CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED
9/3/2024
LAURA A. AUSTIN, CLERK
BY:
    s/A. Beeson
    DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION

| | | |
|---|---|---|
| TERRY A. RIGGLEMAN, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 7:22cv00018 |
| | ) | |
| | ) | **MEMORANDUM OPINION** |
| v. | ) | |
| | ) | By: Norman K. Moon |
| KYLE SMITH, M.D., | ) | United States District Judge |
| | ) | |
| Defendant. | ) | |
| | ) | |

The sole remaining defendant in this *pro se* prisoner action, Kyle Smith, M.D., moves for summary judgment on plaintiff Terry Riggleman's claim that Dr. Smith was deliberately indifferent in his treatment of plaintiff's Hepatitis C infection. Compl., Dkt. 1. Dr. Smith's motion will be granted, and the Court will award Dr. Smith summary judgment. Dkt. 59.

### I. BACKGROUND

#### A. Plaintiff's Allegations

The facts giving rise to this litigation took place when Plaintiff was incarcerated at the Augusta Correctional Center (ACC). Plaintiff alleges that in May 2018, physicians at the University of Virginia recommended treatment for Hepatitis C and Dr. Smith ignored the recommendation. Compl. at 7. Plaintiff concedes that Dr. Smith signed off on certain diagnostic studies but claims that he would not allow UVA hospital to treat his Hepatitis C. *Id.* at 20. Plaintiff then claims that from June 2018 until January 2020, Dr. Smith was his primary care physician, and during that time, his Hepatitis C went untreated. *Id.* Plaintiff claims that the untreated Hepatitis C caused significant physical injury, substantial risk of harm, and that his condition significantly deteriorated. *Id.*

**B. Previous Motions to Dismiss**

On March 14, 2023, the Court issued an opinion and order granting a motion to dismiss filed by defendants Harold Clarke, at the time the Director of the Virginia Department of Corrections (VDOC), and Dr. Mark Amonette, VDOC's Chief Medical Director. Dkt. 47. In the same order, the Court denied a motion to dismiss filed by Dr. Smith. The Court granted the motion filed by Clarke and Dr. Amonette because plaintiff raised the same claims against them in a separate lawsuit, *Riggleman v. Clarke*, No. 5:17-cv-00063 ("*Riggleman I*"). Thus, the claims against Clarke and Dr. Amonette constituted improper claim splitting. Dkt. 47 at 10. The Court denied Dr. Smith's motion because he was not a party to *Riggleman I*, and based on the limited record before it, the Court concluded that Dr. Smith was not in privity with the *Riggleman I* defendants. *Id.* at 10–16.

**C.  Plaintiff's Medical Treatment**

In support of his motion for summary judgment, Dr. Smith has provided a declaration and relevant medical records from ACC. *See* Exs. A, B, Dkts. 60-1, 60-2, 60-3.[1]

Dr. Smith is a Board-certified physician licensed to practice medicine in the Commonwealth of Virginia. He completed his residency training in 2015 and has practiced primary care medicine since that time. Dr. Smith provides primary care services to inmates at ACC and is currently its Medical Director. Beginning in June 2018, Dr. Smith has been employed by companies contracted with the VDOC to provide healthcare to inmates housed in the ACC and other prisons in the Commonwealth of Virginia.

 Dr. Smith did not begin to manage plaintiff's Hepatitis C until August 2019. Prior to that time, the chronic care physician was Dr. Ricardo Martinez. Ex. A, ¶ 10. Based on diagnostic

---

[1] Dr. Smith also submitted a document under seal relevant to the privity issue. Ex. C, Dkt. 59-1.

studies, treatment for Hepatitis C was not indicated prior to September 2019 when a change was noted in Riggleman's Fibroscan. *Id.*; Ex. B, SA 0439-0444. Once Dr. Smith took over plaintiff's care and there was a change in condition, Dr. Smith obtained treatment for plaintiff, consulted with outside specialists, reviewed studies and labs, and ordered ongoing treatment modalities in accordance with the recommendations of the specialists in addition to utilizing his education, training, and experience to make determinations about on-site monitoring. Ex. A, ¶ 10.

According to the medical records, prior to Dr. Smith's arrival at ACC, a Utilization Management Request was placed for a Fibroscan to be done at the UVA digestive health clinic on May 16, 2018. Ex. A, ¶ 11; Ex. B, SA 0504. At that time, plaintiff was noted to be a 42-year-old male who had been positive for Hepatitis C genotype 1b since 2005. The request was approved. *Id.* Following the Fibroscan, plaintiff was seen by Dr. Martinez on June 18, 2018, who documented that plaintiff did not qualify for treatment at that time per DOC policy. Ex. A, ¶ 12; Ex. B, SA 0560.

Plaintiff was seen for a follow-up regarding his Hepatitis C in the Chronic Care Clinic by Dr. Martinez on September 28, 2018. Dr. Martinez documented: "No chest pain. No SOB. No palpitations. No ankle edema. No nausea/vomiting. No abdominal pain/swelling. No diarrhea. No rashes/lesions." He also noted no new symptoms for diseases. The physical exam was documented as normal. Lab results for the liver function were still pending. Ex. A, ¶ 13; Ex. B, 0551.

Dr. Martinez reviewed the lab results on October 26, 2018, and found that plaintiff did not qualify for treatment for Hepatitis C according to DOC protocol. Ex. A, ¶ 14; Ex. B, SA 0550. The results revealed an Apri Score of 0.534, which is consistent with low risk for cirrhosis. *Id.* Plaintiff also had a Fib 4 score of 1.10; a value below 1.30 is considered low risk for

advanced fibrosis, or tissue injury in the liver. Ex. A, ¶ 14. On January 19, 2019, a Fibroscan was completed at UVA, and the report was sent to Dr. Mark Amonette, VDOC's Chief Medical Director. *Id.*

Dr. Martinez saw plainitff in the Chronic Care Clinic regarding his Hepatitis C on March 27, 2019. Ex. A, ¶ 16; Ex. B, SA 0544. Dr. Martinez noted that plaintiff's Hepatitis C was being monitored with Fibroscan, Apri Score, and Fib-4. Plaintiff reported no new symptoms at that visit. Dr. Martinez ordered a complete metabolic panel and other lab studies at that visit, with a return follow up in 180 days. *Id.*

Although Dr. Smith was not following plaintiff for his Hepatitis C at that time, he did review the lab results as was his custom and practice if lab studies came across his desk. Ex. A, ¶ 17. On April 1, 2019, Dr. Smith reviewed plaintiff's liver function studies and found that they were in an acceptable range for his condition. Ex. B, SA 0733-0734.

The first time Dr. Smith became plaintiff's main physician overseeing his Hepatitis C care was on August 19, 2019. At that time, Dr. Smith wrote that plaintiff was to be "prioritized" for a Fibroscan. Ex. A, ¶ 18; Ex. B, 0537. On September 18, an order was placed to perform the test on site, and it was completed two days later. Ex. A, ¶ 19; Ex. B, SA 0464, 0530. Dr. Smith also ordered an ultrasound of plaintiff's abdomen, which was performed onsite on October 2. Ex. A, ¶ 20; Ex. B, 0731. There were no abnormal findings on the ultrasound. Ex. A, ¶ 21; Ex. B, 0731. However, due to the results of the Fibroscan, which had changed in comparison to the prior study, Dr. Smith referred plaintiff to VCU for treatment. Ex. A, ¶ 21; Ex. B, SA 532, 726.

Plaintiff consented to participate in telemedicine with the VCU hepatology clinic on November 6, 2019. Ex. A, ¶ 22; Ex. B, SA 0439–45. The VCU clinician noted that plaintiff

had been diagnosed with Hepatitis C in 2005. His risk factors included intravenous drug use and prison tattoos. She stated: "Although prior FibroScan study which was done at UVA in 2018 showed no significant fibrosis at all, most recent FibroScan study which was done on 09/26/2019 showed fibrosis median score 13.1 kPa, suggesting advanced fibrosis or cirrhosis. CAP score was 240 dB/m consistent with mild steatosis." The clinician outlined a treatment plan for plaintiff including medications and obtaining an MRI, and she wrote that she "explained to him that there may be a slight delay initiate the treatment as we are waiting for the MRI results. In addition, the cirrhosis of the liver at that time was felt to be early." *Id.*

On November 11, 2019, Dr. Smith placed orders regarding plaintiff's Hepatitis C treatment including an order to obtain approval for the MRI. Ex. A, ¶ 23; Ex. B, SA 0522. The MRI was performed on December 20. Ex. A, ¶ 24; Ex. B, SA 0433–34.

Plaintiff had another telemedicine visit with the VCU specialist on February 12, 2020. Ex. A, 25; Ex. B, SA 0788–793. She documented that she had reviewed the MRI results and had consulted the radiology department at VCU as well. The conclusion was that hepatocellular carcinoma had been ruled out because of the MRI. *Id.* The clinician thus started plaintiff on treatment for Hepatitis C with Epclusa, one pill daily. With treatment he was noted to be doing very well. *Id.* Dr. Smith reviewed this note a few days after the visit and noted that a follow-up MRI would be obtained in six months. Ex. A, ¶ 25; Ex. B, SA 0792.

On March 8, 2020, plaintiff had an episode of acute vomiting as well as abdominal pain and difficulty walking. Ex. A, ¶ 26; Ex. B, SA 0708. He was admitted to Augusta Health acute care hospital for a kidney stone, and on his return, Dr. Smith oversaw his medications and treatment for this unrelated condition. On May 12, 2020, Dr. Smith placed a request through

Utilization Review for the MRI recommended by VCU to be performed every six months pertaining to his Hepatitis C. Ex. A, ¶ 27; Ex. B, SA 0777.

Plaintiff was seen via telemedicine by the VCU specialist again on July 7, 2020. Ex. A,¶ 28; Ex. B, SA 0761–67. She documented that he completed the twelve-week planned Hepatitis C regimen on April 9, 2020, and that HCV RNA was undetectable now, which was encouraging. *Id.* Due to the COVID-19 pandemic, the MRI had not yet been completed and was thus not available at the time of this visit. The MRI was performed on July 13. Ex. A, ¶ 29; Ex. B, SA 0760. The radiologist did not see any suspicious hepatic lesions on this diagnostic study. Ex. B, SA 756–57.

Dr. Smith saw plaintiff in the Chronic Care Clinic on January 11, 2021, after having reviewed the VCU records. Dr. Smith documented his plan to order labs in late February or early March prior to his next VCU appointment and noted that the Hepatitis C had been treated. Ex. A, ¶¶ 30; Ex. B, SA 0810-11. The next telemedicine visit with the VCU specialist took place on March 17, 2021. Ex. A, ¶ 31; Ex. B, SA 0749–53. This physician noted that the last MRI had revealed no abnormal findings. Plaintiff denied any complaints to suggest decompensation. Nutritional counseling was provided and follow-up instructions were given. *Id.*

After reviewing the VCU treatment notes, Dr. Smith ordered a liver ultrasound on March 22, 2021, to take place on September 1, 2021. Ex. A, ¶ 32; Ex. B, SA 0747–48.  The study was performed on September 14, 2021, and the liver was normal. Ex. A, ¶ 33; Ex. B, SA 0621.

Plaintiff was next seen by the VCU specialist on September 15. Ex. A, ¶ 34; Ex. B, SA 0742–45. His most recent labs as well as the ultrasound were reviewed. Plaintiff reported feeling "the best he has been in a while" and denied complaints indicative of decompensation. Ex. A, ¶ 34; Ex. B, SA 0742. There was no change in the monitoring plan. Ex. A, ¶ 34; Ex. B, SA 0744.

A Fibroscan was performed per Dr. Smith's orders on October 29, 2021, and after reviewing the results, Dr. Smith noted that it was improved from the previous study. Ex. A, ¶ 35; Ex. B, SA 0741. He also asked for the report to be forwarded to VCU. *Id.* Plaintiff was seen by a VCU specialist again on April 13, 2022, who noted that plaintiff's physical exam was "normal" and there was no evidence of decompensation at that time. Ex. A, ¶ 36; Ex. B, SA 0736.

Plaintiff is no longer an inmate at the ACC. However, at the time he left the facility, he remained stable with regard to his Hepatitis C. Ex. A, ¶ 37.

## II.  ANALYSIS

### A. Summary Judgment Standard

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The party seeking summary judgment bears the initial burden of showing the absence of any genuine issues of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). If the moving party meets this burden, the nonmoving party "may not rest upon the mere allegations or denials of its pleading, but must set forth specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In reviewing the supported underlying facts, all inferences must be viewed in the light most favorable to the party opposing the motion. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Additionally, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586.

That is, once the movant has met its burden to show absence of material fact, the party opposing summary judgment must then come forward with affidavits or other evidence demonstrating there is indeed a genuine issue for trial. Fed. R. Civ. P. 56(c); *Celotex Corp.*, 477 U.S. at 323–25. Although all justifiable inferences are to be drawn in favor of the non-movant, the non-moving party "cannot create a genuine issue of material fact through mere speculation of the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985).

The court is charged with liberally construing complaints filed by *pro se* litigants, to allow them to fully develop potentially meritorious cases. *See Cruz v. Beto*, 405 U.S. 319 (1972); *Haines v. Kerner*, 404 U.S. 519 (1972). At the summary judgment stage, however, the court's function is not to decide issues of fact, but to decide whether there is an issue of fact to be tried. *See Chisolm v. Moultrie*, No. 4:21-cv-3506, 2023 WL 3631798, at *1 (D.S.C. May 2, 2023). A court cannot assume the existence of a genuine issue of material fact where none exists. Fed. R. Civ. P. 56(c).

**B. Eighth Amendment**

The Eighth Amendment protects prisoners from "unnecessary and wanton infliction of pain." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). That protection imposes on prison officials an affirmative "obligation to take reasonable measures to guarantee the safety of . . . inmates." *Whitley*, 475 U.S. at 320. Some Eighth Amendment violations constitute "deliberate indifference," while others constitute "excessive force." *Id.*; *Thompson v. Commonwealth of Va.*, 878 F.3d 89, 97 (4th Cir. 2017). The deliberate indifference standard generally applies to cases alleging failures to safeguard the inmate's health and safety, including failing to protect inmates from attack, maintaining inhumane conditions of confinement, or failing to render medical

8

assistance. *See Farmer v. Brennan*, 511 U.S. 825, 833–34 (1994); *Wilson v. Seiter*, 501 U.S. 294, 303 (1991).

Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure it was available. *See Farmer*, 511 U.S. at 834–37; *Heyer v. United States Bureau of Prisons*, 849 F.3d 209–10 (4th Cir. 2017). Objectively, the medical condition at issue must be serious. *Hudson*, 503 U.S. at 9. "A 'serious medical need' is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Heyer*, 849 F.3d at 210 (quoting *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008)).

After a serious medical need is established, a successful claim requires proof that the defendant was subjectively reckless in treating or failing to treat the serious medical condition. *See Farmer*, 511 U.S. at 842. "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844). "Deliberate indifference is a very high standard—a showing of mere negligence will not meet it." *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999). Indeed, "many acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference." *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). A mere disagreement between an inmate and a physician over the appropriate level of care does not establish an Eighth Amendment violation absent exceptional circumstances. *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016).

Dr. Smith does not dispute that plaintiff's Hepatitis C is a serious medical need under the constitutional standard, as it is a condition that "poses a substantial risk of serious injury to an inmate's health and safety." *Young v. City of Mt. Rainier*, 238 F.3d 567, 567 (4th Cir. 2001). However, Dr. Smith was not deliberately indifferent to plaintiff's medical needs. Instead, the medical records show that when Dr. Smith was involved with plaintiff's care and treatment, he examined plaintiff, reviewed and ordered diagnostic studies, consulted with outside providers as necessary, tracked the progress of plaintiff's treatment, and addressed plaintiff's complaints in a timely manner. None of Dr. Smith's actions can be considered "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Hixson v. Moran*, 1 F.4th 297, 303 (4th Cir. 2021). Far from it.

For example, plaintiff claims that Dr. Smith was his primary care physician between June 2018 and January 2020. In fact, Dr. Smith did not become involved with plaintiff's Hepatitis C treatment until August 2019. Plaintiff claims that Dr. Smith was aware that he had Hepatitis C and was not being treated for it. However, while plaintiff had been diagnosed in 2005, it was not until his Fibroscan showed changes in 2019 that treatment was indicated according to the VCU specialist. Plaintiff further complains that Dr. Smith would not allow the UVA hospital to treat plaintiff following studies in 2018, but as noted, Dr. Smith was not managing plaintiff's care at that time. Also, plaintiff's studies were all consistent with low risk for hepatic disease in 2018. In sum, the undisputed record demonstrates that Dr. Smith was not deliberately indifferent to plaintiff's serious medical needs.[2]

---

[2] To the extent that plaintiff seeks to hold Dr. Smith liable for the actions or inactions of any of his subordinates, plaintiff has not created an issue of fact on the required elements for supervisory liability. *See Carter v. Morris*, 164 F.3d 215, 221 (4th Cir. 1999) ("A plaintiff must show actual or constructive knowledge of a risk of constitutional injury, deliberate indifference to that risk, and an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.").

In response, and in a vain attempt to create issues of fact for trial, plaintiff asserts that the facts documented by Dr. Smith in the medical record are "disputed," and that they should be considered inaccurate or "self-serving" because they were authored by Dr. Smith. *See* Dkt. 72 at 12–19 of 35. Yet the records were created contemporaneously at the time of treatment, long before this litigation commenced. Such records are recognized as having independent evidentiary value. *See* Fed. R. Evid. 803(4). Plaintiff also asserts that there are disputes of fact about the significance of certain studies and lab values, as well as what Dr. Smith was "responsible" for and "knew." Dkt. 72 at 12–19 of 35. These disputes are not material because plaintiff does not, and cannot, dispute that he did receive treatment from Dr. Smith. Plaintiff's disagreement with the course of treatment, or his demand for different or more frequent treatment, does not create any material disputed issues for trial.

**C. Claim-Splitting**

Dr. Smith argues, in the alternative, that plaintiff's claims against him, just like plaintiff's claims against Clarke and Dr. Amonette, are barred by the rule against claim-splitting. Given the court's disposition of the merits of plaintiff's claim against Dr. Smith on summary judgment, the court finds it unnecessary to reach this argument.

### III. CONCLUSION

For the reasons stated in the foregoing opinion, Dr. Smith's motion for summary judgment will be granted. The court will issue an appropriate order dismissing plaintiff's claims with prejudice and entering final judgment in this matter.

**ENTER:** This __3rd__ day of September, 2024.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE